Good morning, Your Honors. May it please the Court, my name is Katherine Bookbar, and I am here representing Jamie Hare, the appellant and plaintiff in this case against the Postmaster General of the United States. I'd like to request five minutes for rebuttal, please. Certainly. Your Honors, I'm here today, I'd like to focus on three main issues related to this case. The first one is the District Court repeatedly failed to view the evidence in a light monetary rule to the plaintiff, made numerous improper inferences in defendant's favor, and omitted countless probative facts from its decision. The second main issue is that, in addition, since this appeal was filed, several cases, important cases, have clarified and changed the landscape of retaliation and hostile work environment cases, and all these decisions lead to the conclusion that the District Court decision must be reversed. Those cases are the Supreme Court case of Burlington Northern v. White, and two Third Circuit Court cases, Jensen v. Potter and Moore v. City of Philadelphia. The third main issue, which arises, which is related to both these prior issues, is the focus on, and the necessity of focusing on, the overall scenario in cases. And White's advice, or dictate, that context matters. And as part of that dictate, it's important to consider before and after, before and after protected activity, how things changed, and whether there were threatening or warning comments made with respect to the protected activity that were then followed by a pattern of discrimination and retaliation. Ms. McFarland, this is a case that was tough to get a grip on, because there's so much going on, at least speaking for myself. You have quite a few claims here that you are seeking reversal of. Could you go over the claims, at least list those claims that you are appealing, and maybe at some point discuss how the new standards affect those claims? Sure, Your Honor. The first, the retaliation-based claims comprise hostile work environments, retaliatory hostile work environment, and then failure to promote in advance, unjustified evaluations, excessive hours, which is related to the- Now, these are three separate claims that you're- Well, the- I'm sorry, the- Is that all part of the hostile work environment? That's a good question, and the way that White relates to Jensen is going to have an effect on this case. There have been prior cases where it seems that everything gets lumped into a hostile work environment, and there have been prior cases where each one is looked at as an individual adverse action. This case has both. So there is the failure to promote in advance, the unjustified- Yes, Your Honor, that's failure to promote to a pool position. Failure to promote to a pool position, failure to place in the officer-in-charge positions, which were above Ms. Hare's level. So that was, in effect, each time she was placed in one of those positions, she was paid at the higher rate, and that was a frequent occurrence prior to a protected activity, never happened again after her protected activity. Same with the acting poom. Again, that's a failure to advance. She had been serving as acting poom prior to her protected activity. When her supervisor was out, he was placing her 70 percent of the time as acting poom, and she was paid at that level and received, you know, obviously all the respect and so forth, responsibilities at that level. She never had that happen again after her protected activity. Go ahead and continue your list. The other issues which could be part of the hostile work environment but also could independently be adverse actions are the lack of resources and support which caused her to work excessive hours and ultimately constructive discharge. And then the discrimination-based claims arise because, like stated in Jensen, when adverse actions occur stemming from a sexual harassment complaint, it's really best for the jury to determine whether such incidents would have occurred were the plaintiff a man. That's from the Jensen case. That's from Jensen, correct. And so, again, this was similar to Jensen in that the adverse actions did stem from the initial sexual harassment complaint. Thus, it's best for a jury to determine whether some of these adverse actions occurred as a result of retaliation, as a result of gender discrimination, or as a result of both. The jury's in the best position to determine that. You're also claiming retaliation for failure to send her to the management class, or however you want to characterize it, as I understand it. Correct. Thank you, Judge Van Antwerpen. Shall I continue? Please. Okay. So the retaliation-based claims I'm going to address first, and that comes to my second issue, the cases that have been decided since the appeal was filed. Jensen, the Third Circuit case, held that the Third Circuit did recognize retaliatory hostile work environment cases, and it utilized the five-part hostile work environment standard that had been used for discrimination-based hostile work environments. However, White, which was issued later, stated that the anti-retaliatory provisions of Title VII actually provide broader protection than the anti-discrimination provisions in Title VII, and that the goal of this is to assure cooperation and accomplishment of the Act's goals. It follows, therefore, that retaliation-based hostile work environments should invoke a broader standard than discrimination-based hostile work environments. And the Third Circuit, in more, seemed to imply this by saying that White disagreed with the formulation utilized by Jensen and Robinson. What the plaintiff proposes is that instead of a severe or pervasive conduct requirement in the retaliatory hostile work environment, that perhaps what should be required is conduct that well might have dissuaded a reasonable worker from being or supporting a charge, the language from White. In any event, this case, this appeal, meets both this standard and the more stringent Jensen standard, which brings me into the third discussion with the focus on the overall scenario and the context matters, and actually ties back into the first thing as well. It's important to note that the district court opinion didn't just omit a few facts. It omitted or made inferences in favor of the defendant across the board throughout the entire decision. It had no mention of the evidence of retaliatory animus, the threats and intimidation to drop her claims by numerous wrongdoers. It doesn't mention her supervisor screaming at her on a regular basis, treating her terribly, berating her, causing her emotional distress and severe depression, which led to an FMLA leave, which is literally not in the district court opinion. It doesn't mention any of the... Was she screamed at before she filed the complaint? She was not, Your Honor. Was it the same supervisor? She had had that supervisor for about four months or so, or five months, before his relationship with the protected activity. Was that Bruce or Ruth? That's Jeff Ruth, yes. So she had entered that position in April of 2001, and what happened was in August of 2001, she had to ask for time off to go to depositions for the EEO action. And in that... Following that request for time off, he initiated... Jeff Ruth initiated... This is her direct supervisor, initiated an extremely adversarial, nasty conversation with her, telling her she would never be able to prove her claims, that she would ruin her career if she pursued her claims, that he didn't know that he could consider her for a promotion if she continued to pursue her claims. Very threatening, nasty conversation. He demeaned her. He demeaned Ms. Hare. She started to cry. He demeaned her for crying, said there's no place for this in this organization. So that whole conversation was a breakdown of their relationship, and from there on out, he went out of his way to withdraw resources from her, to not support her in her position, and that caused her to berate her constantly. In many cases, the district court concluded that there was no adverse employment action. But, of course, Burlington Northern has changed the landscape significantly. How does that change the strength of your case? Well, I think it strengthens our case significantly because of the broader standard applied. Previously, the standard was that it had... that adverse actions had to be... change the terms and conditions of your employment. And although I do actually think in this case that most of these actions didn't change the terms, the concept that it might well dissuade a reasonable employee from bringing an action is clearly a broader standard. If an employee were to know that as a result of pursuing an action, she would not be promoted. She would be screamed at and berated on a regular basis. She would be... she would have to work 12 to 16 hours a day, six days a week. You know, she would, you know, no longer be considered as part of the employees that were expected to attain upper management. This is a woman who, in her... when Dan Rice, her supervisor, had written up her succession plan, he said she would be ready to serve in his position by the year 2000. So this is not... this is not somebody who was hoping for something that wasn't attainable. It's clearly a less stringent standard than the one that the district court applied. What do you think is the remedy, then? Do you think the case has to go back or reconsideration? I mean, if we were to adopt your view? I think that it needs to be reversed, absolutely. Well, reversed or should the district court have an opportunity to reconsider and write up the new standard? It was not available to it when it decided so in judgment. Your Honor, I... because of how much was disregarded by the district court, I think that the evidence is there before you that you could judge that it did... that it does meet those standards. I don't think it's necessary for it to be remanded for reconsideration by the district court. There have been many cases that have been... that have reversed. For example, Moore, I believe, did reverse the decision. It didn't... didn't say that the district court needed to go back and reconsider it in light of the new cases. Thank you. Thank you very much. Thank you, Your Honor. We'll get you back. Ms. Parker? Good morning, Your Honors. My name is Vivica Parker. I'm an assistant U.S. attorney here in Philadelphia, and I represent the appellee, the United States Postal Service. Your Honors, all of the appellant's allegations and arguments emanate from one perspective, her own. But that's not enough to make out a claim. Vital elements are missing from her analysis, the causal links and the objective standard. And when we examine the allegations from the perspective of a reasonable employee, the claims fail. Because, Your Honor, as this court has repeatedly reminded us, we need to look at the totality of the circumstances. And when you balance the failure to place her in that one class, that one time, although it may have made her unhappy, it didn't inhibit her advancement within the post office. She was subsequently promoted to the level 20 position of the postmaster at Nazareth. Also, it wasn't retaliatory because the very person that she was claiming against, Mr. Burke, was retaliating against her, was a member of a group, a selection group. Also a member of that group was her champion, Mr. Rice. And as a group, they decided that there were other candidates who were better suited and more senior and were better qualified to take that particular class. So the problem, just following up on Judge Van Antorpen's question, is that if you don't get through a CMP class, your chances of advancing beyond the next stage are very small. You've got to get through that course. And there was testimony in the record that that's a critical, critical course for anyone interested in elevating to the higher positions in the postal service. Your Honor, I beg to differ. The facts of the matter are that a number of post office employees were elevated who had not taken that class. In one instance, one person who was elevated happened to have taken that class. But Ms. Hare herself was promoted without having taken that class. And there were others. She was promoted to what? To postmaster? Correct. Of a postal facility? Yes, of the Nazareth facility. But of course, to get beyond that position, don't you need to have gone through the CMP course? There is no evidence to that effect in the record, Your Honor. None at all. I thought there was testimony from several individuals. Perhaps Reese said that that's a critical course for advancement? No, I disagree, Your Honor. I don't think that's in the record. It could have been helpful. It was a class that people who had been, there were numerous instances of people who had been promoted who had not taken that class. I'll let Bookbar correct my mistake and impression, if that's so. Go ahead. The retaliation claims that Ms. Hare is making don't survive under the White and Moore analyses because she hasn't shown an objectively material injury that might well have dissuaded an employee from engaging in protected activity. The gender discrimination claims that she's making don't survive under Jensen because she hasn't shown that a reasonable employee would have been detrimentally injured by the conduct that she's claiming. Hostile environment, under Jensen again. Severe or pervasive, she hasn't shown it using an objective standard. Not promoting her to the prune position, for example, in 2000. There's no causal link there between her claim of retaliation and her non-promotion. The record is clear that the selecting committee simply didn't select her as one of the five candidates for Mr. Burke to interview. So she hasn't established that Mr. Burke made the initial selection that eliminated her from consideration. Who was on this committee that decided that? Various other postal employees who were just one step below Mr. Burke. I don't believe Mr. Rice, her current supervisor, was on that committee. But others who were unaware of her claim, unaware of her discussion with Mr. Burke about Mr. McCullough's behavior, were on that committee. There's no evidence that anyone, in fact, they all testified that they were unaware of her claim when they sat on that committee and chose those five candidates that didn't include her. That's on the record. It is. The CMP class, again, not objectively material injury that would have dissuaded a reasonable employee from engaging in the EEO process because... Let me ask you this. What in the record shows that Kathy Wells, who got CMP, wasn't selected by Burke or his managers? Don't the emails show that Wells was nominated by Reid, who reported to Burke? Your Honor, if I could just explain a little bit. The Kathy Wells situation, I believe, is one where I have to distinguish for your honors that there is the post office functions and then there are the more, how should I put it, mechanical functions. Kathy Wells came from a different section of the post office functions than Ms. Hare did. And so I believe she had a lower grade. I believe she was a grade 16. But because her division, so to speak, was allowed to nominate class attendees, she was the one that was nominated by that division, which is separate from the division, which was the post office customer service division that Ms. Hare served in. But didn't the selection go across divisions? It did. It did. However, Ms. Wells was chosen and the claim by Ms. Hare that she was chosen as retaliation against Ms. Hare, there is no evidence that Ms. Wells was chosen for that reason. She was chosen because she was nominated by her division. And she was found by that committee, that group that included Ms. Hare's champion, Mr. Rice, to be qualified to take that class.  I believe Your Honor is thinking of her grade level. Her grade level, yes. Again, you have to look at all the circumstances. She came from a separate division and she was the only nominee from that division. This was not the only opportunity to take this class. This was not the only one time to take this class. A group decided, that included Mr. Burke and Mr. Rice, a group decided that these were the people who should take this class at this time. And importantly, Ms. Hare was promoted by Mr. Burke less than a year later to a level 20 postmaster. Could Ms. Hare have taken the course later on or what happened about that? It's my understanding there's no definite evidence in the record of when the course was offered again during the five years that Ms. Hare is claiming that she was retaliated against. But there's no evidence that it was a one time course. She doesn't allege that herself. Is that a course that's offered to regional postal facility employees? I mean, is it regional versus national or is it state based? I believe the course is offered regionally just for convenience purposes. I may be misspeaking, but it's offered throughout the post office nationally, but the course that you might be selected to take would be taking place regionally. Tell me what the purpose of the course is. To enhance the managerial abilities and experience and skills of those who show potential. Potential for what? For advancing and becoming upper management. And yet you say it's not important for someone like Hare to move forward in the ranks? It may be someone's opinion that it would be important, but the fact of the matter is that people, including Ms. Hare, were advanced to upper management without taking that class. And Wells took the class. Did she get promoted after that? I don't know, Your Honor. Oh, it's not in the record. That's not in the record. And she was, again, in a separate division of the post office functions. With regard to Mr. Ruth's interaction with Ms. Hare, I ask the court to remember that after Mr. Burke, who Ms. Hare claimed was the person retaliating against her, promoted her to the postmaster position in Nazareth in April, Ms. Hare testified that she had a fine relationship with Mr. Ruth until August of 2001, when she had that conversation with him about her EEO deposition. And from that time forward, according to her, he was berating her, screaming at her, and so forth. But if you look at the record, Your Honor, you have to remember that Ms. Hare went out on extended leave on November the 9th. The record shows that the only time that Mr. Ruth screamed at her on the telephone was sometime during one day between November 6th, when she came back from sick leave, and November 9th, when she went out on FMLA leave. So during three phone calls during one day between November 6th and November 9th is when she alleges he screamed at her. Other allegations that she makes, including short-staffing, there's no evidence that he was short-staffing her as retaliation for Mr. Burke's activity. I think it's important to remember that a reasonable employee would look at the situation and say, look, I think Mr. Burke is retaliating against me because I complained about Mr. McCullough's behavior. Mr. Burke, in the meantime, has promoted me. And now Mr. Burke is retaliating against me through the actions of Mr. Ruth? All right, so Mr. Ruth is retaliating against me on behalf of Mr. Burke. Okay, got that. Now how is he doing that? He's short-staffing me. He's not providing me the resources that I need. But there's no evidence in the record that that was true. For example, she thought it was true, but that's a subjective view. That's not the reasonable employee. The reasonable employee says, I'm aware I'm a postmaster. I'm aware that there are staffing issues. Importantly, the staffing issues that she specifically asked Mr. Ruth about, he obliged her specifically in the record. She asked for a supervisor, the next level down below her as postmaster at the Nazareth Post Office. He gave her one, Mr. Skirczak. She didn't like Mr. Skirczak. She was unsatisfied with his performance, and she asked Mr. Ruth to remove him, and he did. The next time the post office was directly responsive to her request was with regard to Mr. Ruth himself. Before that, could you comment on the acting, I guess, postmaster of the station who came in and changed the locks of the postmaster's office? Yes, Your Honor. And you also conducted an audit of the stamp inventory? I certainly can, Your Honor. Ms. Hare went out on FML leave. She was out from early November until the end of January of 2002. During that time, she took the keys to the office with her. She also knew the combinations to certain safes. There were no spare keys in the station? Apparently not. Apparently she hadn't provided them or left any. So there was a problem with keys, and she did not want to be disturbed at home on her leave, and she complains about that in her brief. She makes that very clear, that she didn't want to have to come in, she didn't want to be called, and so forth. Somebody did call her while she was there. She did. They did. And she complains about that. Right. Finally, Mr. Ruth said, look, we've got to get into the safes and get to the stock. We've got to change the locks and change the combinations. As far as the stamp stock audit, that is not an unusual thing. Whenever a postmaster changes at a post office, the stock is accounted for so that it's clear from one postmaster to the next what stock is there, what was left, and so forth. And, in fact, a stock audit was done when Ms. Hare resumed her position at Nazareth when she came back from leave. It's important to remember that the post office, when she asked that Mr. Ruth no longer be her poom, they obliged her. He was no longer her poom as soon as she asked for it. There was an event where awards were given to a number of postal employees. I don't know if we're speaking of the same one who substituted for Hare, but apparently, or maybe it was, that acting postmaster was given an award, whereas Hare was overlooked an award for outstanding service. I think she claims that, of course, that was a slight, and it was intended to embarrass her. Your Honor, giving someone else an award for doing outstanding work is not discrimination against Ms. Hare. It just isn't. She wasn't even at that. It was all the overall conduct to harass her. I'm sorry? She's claiming about the overall conduct of the postal authority to embarrass her and to harass her. Those are her contentions. Those are her contentions, and that's exactly my point. If you examine the facts in the record, you'll find that, frankly, nothing plus nothing equals nothing. Each one of the claims she's making, if you look at the facts, don't add up to an objectively material injury that would dissuade an employee from engaging in the EEO process. Yeah, we have to consider the overall scenario. I mean, you can offer a plausible non-discrimination reason for each instance, but we have to look at the overall scenario. Isn't it a little suspicious that she had so many problems after she complained? Well, if you look at the record, Your Honor, they're not as problematic as she claims. The berating and screaming incident, for example, one day, she makes it sound as though it went on for months. It couldn't have. Her relationship with Mr. Ruth deteriorated by her own allegations in early August, and she was out at the beginning of November, and he was replaced as her poom as soon as she asked for it. Also, Your Honor, looking at the totality of these circumstances, it's vital to remember that a reasonable employee would look and say, well, the person I'm claiming and have filed a claim against has promoted me to a level 20 postmaster, and as soon as I expressed my desire for a different poom, the post office replaced Mr. Ruth, and I no longer had to deal with him. Those are part of the totality of the circumstances that have to be taken into consideration in determining whether she's laid out a prima facie case on all her claims, which she hasn't done, and we would urge this court to affirm the summary judgment of the district court. Thank you, Ms. Parker. Thank you. Ms. Boockvar? Oh, I'm sorry. Judge VanTorpen, did you have any further questions? No, sir. Okay, thank you. Thank you, Your Honor. I wanted to start. I was not able to find a specific reference that you were referring to in Dan Rice's deposition in this time period, but I want to concede plaintiff does not say that the CMP program was a requirement for upper management, but it cannot be contested that it was a significant and very important factor in considering who was in the group of employees that were bound for upper management. Defendant is absolutely wrong in saying that Jamie Hare was promoted to upper management. Postmasters, though management, are not upper management. It's district managers and so forth. That's upper management. Did she have another chance to take this course, or is it just one time in a lifetime? She would have had to be recommended by her supervisor, so she was never recommended by a supervisor again. Well, the postmaster, as I understand, says, postmaster general says, that really this was a different committee, and the committee didn't know anything about her claim of discrimination. I think there may be some confusion between the CMP committee and the hiring for the PUM job. The CMP committee comprised Ed Burke, who obviously several days earlier, he was fully involved with Jamie Hare's activity. He was the main decision maker. All this discussion, the postmaster general's lawyers have repeated so many times that Ed Burke wasn't involved in the promotion of Kathy Wells to this position, to the CMP program. Like Judge Van Antwerpen said, the emails are completely clear. There's an email from Ed Burke's, the person below him, Bobby Rade, who supervised Kathy Wells. Bobby Rade recommended Kathy Wells, a level 16 person to this program, and she was chosen by Ed Burke and his committee to serve on that. Did he have control of the committee, or was he just one person on it? That I'm not sure, Your Honor. Did he say he had control, or did anybody say he was in full control? I don't know, Your Honor. But the point is that he has been repeatedly distruthful in saying that she came from a different place. She was not nominated by the other person from the operations side. Again, the emails are completely clear. The operations side, Karen Rainey nominated other people, not Kathy Wells. So the truth is that it was nominated by one of Ed Burke's people, and she was involved in that committee, and he did intentionally choose her over Ms. Hare. He and the committee, perhaps, but the fact is he chose a lower level, so he went outside the accepted procedures for filling those slots. Ms. Parker said that the one perspective of Jamie Hare is not enough in looking at these things, but the fact is that it's well established that any evidence that could be shown that would lead to inferences in plaintiff's favor at this stage of the proceedings is to be given weight at this point in the proceedings. And whether that's coming from Jamie Hare's testimony or depositions or her doctor's reports or any other place, that's valid evidence at this stage of the proceedings. I had a question about the discrimination based on the McCullough sexual harassment claim. Now, the district court dismissed that because you didn't file the EEO complaint in time. Do you have any problem with that decision? It seems like a pretty straightforward statute of limitations issue. Well, Your Honor, we argue in the brief and believe that it should be considered timely for several reasons, one being the fact that she immediately filed. The same day she notified management of the circumstances, she immediately followed his direction. So everything that her supervisor and the district manager told her to do with respect to that complaint, she immediately did. She was prompt and she was diligent, and they discouraged her from doing anything else. And that's been held to be unacceptable in these kinds of situations. Plus, it was the first step in the hostile work environment that was then perpetuated against her, so we believe it should be included as part of the hostile work environment. Ed Burke then began discriminating against her in the way that he investigated that complaint, treated her very badly, really made her feel bad about what she might do to the harasser's family, really encouraged her to drop that complaint. My time is up. I don't know if you have any other questions. I just have one brief question. I'm trying to recall. If we did remand some of these claims, are they ultimately heard non-jury for hearing on the merits? I'm sorry. Are they ultimately heard? Yeah. Do you have a right to a jury trial on this matter? Yes, Your Honor. You do? Okay. I was just trying to recall. Okay. Thank you. Ms. Bookbar, thank you very much. Thank you, Your Honor. And Ms. Parker, thank you. Both very well-argued cases. We'll take it under advisement. Thank you, Your Honor. Thank you. The second case, Joanne Ward.